| | | |
|---|---|---|
| RON NOLLNER and BEVERLY NOLLNER, | ) | |
| | ) | |
| **Plaintiffs,** | ) | **Case No. 3:12-cv-00040** |
| **v.** | ) | **(Consolidated with** |
| | ) | **Case No. 3:12-cv-00043)** |
| SOUTHERN BAPTIST CONVENTION, INC.; | ) | |
| THE INTERNATIONAL MISSION BOARD | ) | **Judge Aleta A. Trauger** |
| OF THE SOUTHERN BAPTIST | ) | |
| CONVENTION, INC.; and GLOBAL | ) | |
| ENTERPRISE SERVICES, LLC, | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

Pending before the court are several related motions.  Defendants Global Enterprise

Services, LLC ("GES") and the International Mission Board of the Southern Baptist Convention,

Inc. ("IMB") (collectively, "IMB Defendants") have filed a Motion to Dismiss (Docket No. 6), to

which the plaintiffs filed a Response (Docket No. 23), and the IMB Defendants filed a Reply

(Docket No. 31).  Defendant Southern Baptist Convention, Inc. ("SBC") has filed a Motion to

Dismiss (Docket No. 10), to which the plaintiffs filed a Response (Docket No. 22), and SBC filed

a Reply (Docket No. 32).  In support of the plaintiffs' Responses to both Motions to Dismiss, the

plaintiffs filed the Affidavit of Ron Nollner (Docket No. 25) and the Affidavit of Samuel D.

Payne, Esq. (Docket No. 26).  SBC and the IMB Defendants have filed Motions to Strike those

affidavits (Docket Nos. 28 (SBC) and 29 (IMB Defendants)), to which the plaintiffs have not

responded.

For the reasons stated herein, the Nollners' claim under the Dodd-Frank Act will be

dismissed with prejudice, the court will decline to exercise supplemental jurisdiction over the

Case 3:12-cv-00040   Document 36   Filed 04/03/12   Page 1 of 27 PageID #: 366

remaining state law claims, and the case will be remanded to state court. The Motions to Dismiss will be denied as moot except as to the Dodd-Frank Act claim, and the Motions to Strike will be denied as moot.

## BACKGROUND

### I.  Procedural History

On October 20, 2011, the plaintiffs, Ron Nollner and his wife, Beverly Nollner, filed this lawsuit in Tennessee state court. (Docket No. 1, Ex. A ("Complaint").) The Complaint alleged that the Nollners are Tennessee residents, SBC is a Georgia corporation with a principal place of business in Tennessee (*i.e.*, not diverse from the plaintiffs), IMB is a Virginia corporation, and GES is a Virginia Limited Liability Company. The original Complaint asserted claims under Tennessee law for breach of contract, promissory estoppel, and retaliatory discharge under Tennessee common law and the Tennessee Public Protection Act ("TPPA"), § 50-1-304 *et seq*.

On December 9, 2011, the plaintiffs filed a First Amended Complaint (Docket No. 1, Ex. B), which added a claim for retaliatory discharge under the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank Act" or "DFA"), 15 U.S.C. § 78u-6 – *i.e.*, a claim arising under federal law. On January 6, 2012, the IMB Defendants removed the action, on the grounds that this court has original federal question jurisdiction over the DFA claim and supplemental jurisdiction over the state law claims. (Docket No. 1.)[1]

---

[1]SBC also filed a separate notice of removal, which was docketed as a separate action at Case No. 3:12-cv-00043. SBC initially filed identical versions of its Motion to Dismiss in both that action (*see* Case No. 3:12-cv-00043, Docket No. 13) and this one (Case No. 3:12-cv-00040, Docket No. 10), after which this court consolidated both matters into this docket. Nevertheless, SBC's Motion to Dismiss remains "pending" in Case No. 3:12-cv-00043.

2

## II. **Complaint Allegations**[2]

Mr. Nollner is a Tennessee resident with decades of experience in the construction industry and is a devoted member of the Southern Baptist community. At some point in or before April 2008, IMB, which is a wholly owned subsidiary of SBC, posted a job vacancy to perform missionary-related work on the church's behalf in New Delhi, India. (Docket No. 1, Ex. B ("Job Vacancy Announcement").) The Job Vacancy Announcement solicited candidates to manage construction of a new office building in New Delhi, including working with local companies, assisting in obtaining necessary permits, and ensuring that engineering standards were followed. It also indicated that the term of employment would be a minimum of 24 months and a maximum of 36 months. Furthermore, it included a "Spouse Assignment Description," which stated that the candidate's spouse would "be a vital part of the team," reflecting an intent to hire both the construction manager and his or her spouse.

IMB encouraged the Nollners to take the positions identified in the Job Vacancy Announcement. In October 2008, at IMB's urging, the Nollners accepted the positions,[3] which they understood would last at least one 36-month term. In anticipation of moving to New Delhi for this extended period, the Nollners sold essentially all of their assets, Mr. Nollner gave up his active construction career, and Beverly Nollner gave up her job of 17 years.

When the Nollners arrived in New Delhi, the situation was not what had been promised.

---

[2]Unless otherwise noted, the facts are drawn from the First Amended Complaint. The court draws all reasonable inferences in favor of the Nollners. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986); *Brown v. United States*, 583 F.3d 916, 919 (6th Cir. 2009).

[3]As explained in the next section, the defendants contend that the employment relationship actually began in May 2008.

3

The planning and permitting phase of the project had already been completed and the defendants[4] would not allow Mr. Nollner to meet with the architect or contractor for the job at issue until April 2009 – well into the project.  Over the next several months, Mr. Nollner also became aware of a host of troubling information, including the following:

- Before Mr. Nollner arrived, the defendants hired a contractor and an architectural firm (both of which were controlled by the same individual) without any competitive bidding process and without entering into a written contract.

- IMB was operating the project through a number of "dummy" companies, perhaps as part of a scheme to conceal the nature of its activities;

- The workmanship and materials utilized in the building were below standards and unsafe;

- The defendants were maintaining suspiciously incomplete records regarding job-related invoices and payments;

- IMB refused to furnish Mr. Nollner with building specifications for the

---

[4]Nollner often refers to "the defendants" interchangeably, without distinguishing between SBC, IMB, and GES.  According to Nollner, GES was his nominal employer (a "dummy" company), IMB and SBC constituted his actual employer(s), and/or SBC and the IMB Defendants were *alter egos*.  However, SBC specifically contests that, under the Rule 12(b)(6) standard, it may be regarded as the Nollners' employer or otherwise held liable for the conduct of IMB and GES under any theory of liability.  Notwithstanding SBC's position, the court will similarly refer to "the defendants" interchangeably for purposes of this Memorandum.  This should not be construed as reflecting a decision by the court concerning the merits of the Nollners' allegations and their theories of liability as they relate to SBC, issues that the court does not reach.

Similarly, the Nollners allege that SBC and/or IMB operated the New Delhi project through a network of "dummy" companies or designees, variously identified as "The India Bible Society," the "Indian Baptist Society," and/or "IBS-Bangalore."  Rather than repeatedly describe the allegations as referring to "IMB, GES, or its agents/designees," the court will simply refer to these entities collectively as "IMB"or "the defendants" with respect to the factual allegations.  Again, this should not be construed as reflecting any judgment by the court concerning the liability of SBC, IMB, and/or GES for the actions of any of the other alleged related entities.

project until July 2009;

- The contractor and architect attempted to bribe Mr. Nollner several times after he complained about their performance;

- The contractor and architect were paying bribes to local Indian officials with money furnished by the defendants for that purpose;

- The defendants had received an improper or illegal permit (referred to as a "sanction" in India) from the Indian government. The sanction was issued pursuant to affirmative misrepresentations by the defendants to the Indian government (including falsified design specifications), which represented that the building would be utilized for "residential" rather than "commercial purposes," perhaps to avoid compliance requirements for commercial structures. Debbie Harrison had signed the illegal permit on behalf of IMB.

Mr. Nollner reported these practices and potential illegalities to his supervisors multiple times, but they ignored his entreaties. When Mr. Nollner reported his grave concerns about potential bribery to the defendants' employees, they "seemed unbothered, if not complicit." (First Am. Compl. ¶ 46.)

On or about October 21, 2010, two of Mr. Nollner's superiors asked him to resign his position in India.[5] After Mr. Nollner refused to resign, the defendants terminated his employment on or about October 23, 2010, claiming that his position was no longer necessary. The Nollners scrambled to make arrangements to relocate to the United States. They returned to Nashville, where they currently reside.

Based on these allegations, the Nollners assert that the defendants are liable under Tennessee state law for breach of contract, promissory estoppel, retaliatory discharge under the common law and the TPPA , and under federal law pursuant to the DFA. With respect to the

---

[5]The Complaint does not specifically identify any conduct that took place between approximately August 2009 and October 2010.

retaliatory discharge claims, the First Amended Complaint states that the Nollners were terminated for reporting about "unsafe building practices and permits" and for reporting and/or refusing to participate in "bribes and other illegal payments." (First Am. Compl. ¶¶ 54-55.) As to the DFA, the Nollners allege that the DFA's whistleblower anti-retaliation provisions (15 U.S.C. § 78u-6(h)(1)(A)(iii)) protected Mr. Nollner against retaliation for reporting the defendants' violations of the Foreign Corrupt Practices Act ("FCPA").

### III.    Motions to Dismiss and Related Motions to Strike

In reliance on Tennessee state law, SBC contends that the Nollners' claims against it must be summarily dismissed pursuant to Rule 12(b)(6), because SBC did not employ the Nollners and because the allegations do not establish that SBC and the IMB Defendants are "alter egos." The IMB Defendants have also moved to dismiss, on two separate grounds. First, they argue that all the claims must be dismissed under Rule 12(b)(6) because: (1) the state law claims are governed by Virginia law – not Tennessee law – under which all of the claims fail as a matter of law; and (2) the DFA whistleblower anti-retaliation provisions are inapplicable to Mr. Nollner's disclosures of alleged FCPA violations by the defendants. Second, the IMB Defendants argue that the case should be dismissed under Fed. R. Civ. P. 12(b)(3) because venue is not proper in the Middle District of Tennessee.

Among the materials attached to their Complaint, the Nollners attached the April 2008 Job Vacancy Announcement for the New Delhi position, on which they rely as defining certain terms and conditions of their employment relationship. In response, the IMB Defendants filed the Declaration of Doug Floyd (Docket No. 8) and the Declaration of Randy Pegues (Docket No. 9), which allege facts and attach supporting records relating chiefly to: (1) the nature of the

contractual relationship (or lack thereof) between SBC, IMB, and GES on the one hand and the Nollners on the other; and (2) the propriety of venue in this court. In particular, the Floyd Declaration avers that IMB and the Nollners entered into an employment relationship in May 2008, in which the Nollners agreed that, "[o]nce approved for service, your relationship to the IMB will be that of an 'at will' employee of a Virginia religious, non-profit corporation, with all aspects of that relationship originating in Virginia and *controlled by Virginia law* and applicable First Amendment law, including the 'ministerial exception.'" (Floyd Decl., Ex. B (May 6, 2008 Letter from Doug Floyd to Nollners, with accompanying Acknowledgment Form signed by the Nollners on May 11, 2008) (emphasis added).)[6]

In support of their Responses to the defendants' arguments and to the additional factual materials introduced by the defendants, the Nollners filed an affidavit from Mr. Nollner (Docket No. 25) and an affidavit from his attorney, Samuel D. Payne (Docket No. 26). The Nollner Affidavit introduces a host of additional facts, which chiefly relate to: (1) the relationships between and among the Nollners and the defendants; (2) the Nollners' activities in advance of departing for India; (3) the nature and locus of the Nollners' contractual relationship with the defendants; and (4) the inconvenience to the Nollners of trying the case in another venue. In relevant part, Mr. Nollner declares that the record concerning the Nollners' employment contract with the defendants is incomplete for at least two reasons. First, he avers that he and his wife

---

[6]The defendants argue that, to the extent the affidavits concern the employment relationship between the Nollners and the defendants (among other issues), those materials are properly considered at this stage because the Nollners' allegations placed that relationship at issue. Because the court does not reach the employment relationship issues raised by the parties, the court does not rely on the defendants' additional materials and, therefore, makes no ruling concerning the propriety of considering them at this stage.

signed a separate document specifying different or additional terms than those stated in the Job Vacancy Announcement and the May 6, 2011 Floyd letter, but that he and his wife have been unable to locate the document, which he believes the defendants possess. Second, during pre-departure training at IMB's offices in Virginia in late 2008, the Nollners were told that only "lifestyle issues" could result in their termination from the New Delhi position before the 36-month term was completed – *i.e.*, that the parties agreed to additional employment terms after May 2008.[7] The Payne Affidavit asserts certain facts relating to venue.

The defendants have moved to strike the Nollner Affidavit and the Payne Affidavit as (1) improperly introducing materials outside the pleadings; and/or (2) improperly seeking to introduce facts that constitute hearsay and/or are otherwise unsupported by personal knowledge.

## IV.    Issues Before the Court

The pending Motions to Dismiss and related Motions to Strike raise a host of issues regarding the viability of the Nollners' claims and the appropriate forum for their resolution. The parties disagree whether Tennessee or Virginia law governs the state law claims, and the Nollners have suggested that additional discovery is necessary on this point. The parties have introduced a host of materials outside of the pleadings, some of which are contested. And the parties have suggested that, should the court find that any of the claims are viable, the parties may need to conduct some discovery concerning venue. Furthermore, the Nollners have requested that, if the court construes their state law claims as arising under Virginia law, they be permitted to re-plead their state law causes of action in accordance with Virginia law.

---

[7]The Nollner Affidavit also asserts various facts relating to venue, including the purported location and relevance of "key potential witnesses," as reflected in a "Witness Chart" attached to the affidavit. (Nollner Aff., Ex. A.)

8

In addition to the issues raised by the parties, the court has identified an additional concern *sua sponte*. For the reasons stated herein, the court finds that the DFA claim fails as a matter of law. Because that claim is the only federal cause of action asserted in the First Amended Complaint, the court must consider whether it retains jurisdiction over the pendent state law claims, regardless of whether Virginia or Tennessee law applies.

## STANDARD OF REVIEW

In deciding a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). The Federal Rules of Civil Procedure require that a plaintiff provide "'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957) (quoting Fed. R. Civ. P. 8(a)(2)). The court must determine whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974)).

The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[threadbare] recitals of the elements of a cause of action," but, instead, the plaintiff must plead "factual content that allows

9

the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949-50, 173 L. Ed. 2d 868 (2009).

**ANALYSIS**

I.    **Dodd-Frank Act Claim**

      A.    **The Dodd-Frank Act**

           (1)    Anti-Retaliation Provisions

The DFA contains a section entitled "Securities Whistleblower Incentives and Protection," 15 U.S.C. § 78u-6 (2012), which, *inter alia*, provides a private cause of action for whistleblowers alleging retaliatory discharge or other forms of discrimination under certain circumstances. *Id.* § 78u-6(h)(1)(B)(i).

The Act defines a "whistleblower" as "any individual who provides, or 2 or more individuals acting jointly who provide, information relating to a violation of the securities laws to the Commission [*i.e.*, the SEC], in a manner established, by rule or regulation, by the Commission." *Id.* § 78u-6(a)(6). The anti-retaliation provisions of the DFA protect whistleblowers from retaliation in three categories of circumstances, as follows:

> No employer may discharge . . . or in any other manner discriminate against, a whistleblower in the terms and conditions of employment because of any lawful act done by the whistleblower - -
>
>     (i)      in providing information to the Commission in accordance with this section;
>
>     (ii)     in initiating, testifying in, or assisting in any investigation or judicial or administrative action of the Commission upon or related to such information; or
>
>     (iii)    in making disclosures that are required or protected under the Sarbanes-Oxley Act of 2002 (15 U.S.C. 7201 *et seq.*), the Securities Exchange Act of 1934 (15 U.S.C. 78a *et seq.*), including

10

section 10A(m) of such Act (15 U.S.C. 78f(m)), section 1513(e) of
Title 18, and any other law, rule, or regulation subject to the
jurisdiction of the Commission.

*Id.* § 78u-6(h)(1)(A).

(2)    The Reporting Requirement

By their own terms, the first two anti-retaliation categories protect whistleblowers who

report potentially illegal activity to the SEC or who work with the SEC directly, in some manner,

concerning potential securities violations.  By contrast, the third category does not require that

the whistleblower have interacted directly with the SEC – only that the disclosure, to whomever

made, was "required or protected" by certain laws within the SEC's jurisdiction.  *See Egan v.*

*TradingScreen, Inc.*, No. 10 Civ. 8202(LBS), 2011 WL 1672066, at *5 (S.D.N.Y. May 4, 2011);

Securities and Exchange Commission, Securities Whistleblower Incentives and Protections, 76

Fed. Reg. 34300-01, at *34304, 2011 WL 2293084 (F.R.) (June 13, 2011) (codified at 17 C.F.R.

pts. 240-249) ("[T]he statutory anti-retaliation protections apply to three different categories of

whistleblowers, and the third category includes individuals who report to persons or

governmental authorities other than the [SEC].")[8]  Thus, for example, if one of the referenced

_____

[8]Given the relatively recent enactment of the DFA, only a handful of courts have
interpreted the Act in any respect.  The S.D.N.Y. in *Egan*, which is the only case cited by the
parties, appears to be the only court to have interpreted the anti-retaliation provisions at issue
here.  The SEC has also provided some interpretative guidance concerning these provisions.
Section 922 of the DFA added a new Section 21F to the Securities Exchange Act of 1934
("Exchange Act"), entitled "Securities Whistleblower Incentives and Protection," which directed
the SEC to pay awards, subject to certain limitations and conditions, to whistleblowers who
voluntarily provide original information about a violation of the securities laws that leads to the
successful enforcement of an action brought by the SEC resulting in monetary sanctions
exceeding $1,000,000.00.  *See* 76 Fed. Reg. 34300.  Pursuant to the new Exchange Act Section
21F, the SEC proposed "Regulation 21F" on November 3, 2010, which sought to define certain
terms critical to operation of the whistleblower program, to outline procedures for applying for
awards, and to explain the scope of the whistleblower program.  *Id.*  After receiving comments

11

acts either (a) required an employee to report a potential securities violation internally or (b) protected an employee's disclosure of that information to another federal agency or federal law enforcement officer, § 78u-6(h)(1)(A)(iii) would prohibit retaliation against that whistleblower by the whistleblower's employer.[9]

---

on the proposed regulation, the SEC on June 13, 2011 addressed the comments and issued its final rules (effective August 12, 2011), as reflected in 76 Fed. Reg. 34,100 *et seq*. Although the SEC's final Regulation 21F specifically concerns only the whistleblower incentive program, which constitutes a significant but not exclusive component of the DFA, the SEC's interpretations of DFA whistleblower-related provisions in its June 13, 2011 comments provide guidance to the court concerning certain provisions at issue here.

[9]Accordingly, the plain terms of anti-retaliation category (iii), which do *not* require reporting to the SEC, appear to conflict with the DFA definition of "whistleblower" at § 78u-6(h)(1)(A)(iii), which defines a whistleblower as anyone who reports securities violations "to the Commission." However, both *Egan* (the only court to address this issue) and the SEC have found that category (iii) provides a narrow exception to the definition of a whistleblower as someone who reports only "to the Commission." As the *Egan* court explained:

> A literal reading of the definition of the term 'whistleblower' in 15 U.S.C. § 78u-6(a)(6) would effectively invalidate § 78u-6(h)(1)(A)(iii)'s protection of whistleblower disclosures that do not require reporting to the SEC . . . .
>
> [These] contradictory provisions of the Dodd-Frank Act are best harmonized by reading 15 U.S.C. § 78u-6(h)(1)(A)(iii)'s protection of certain whistleblower disclosures not requiring reporting to the SEC as a narrow exception to 15 U.S.C. § 78u-6(a)(6)'s definition of a whistleblower as one who reports to the SEC. Therefore, Plaintiff must either allege that his information was reported to the SEC, or that his disclosures fell under the four categories of disclosures delineated by 15 U.S.C. § 78u-6(h)(1)(A)(iii) that do not require such reporting: those under the Sarbanes-Oxley Act, the Securities Exchange Act, 18 U.S.C. § 1513(e), or other laws and regulations subject to the jurisdiction of the SEC.

*Egan*, 2011 WL 1672066, at *5; *see also* 76 Fed. Reg. at 34,304 (finding that, with respect to employees of public companies and related entities, the FCPA protects whistleblowers who report to federal regulatory or law enforcement agencies, a member or committee of Congress, or a person with supervisory authority over the employee with authority to investigate, discover, or terminate misconduct).

12

With respect to the scope of part (iii), the "catch-all" anti-retaliation protections extend only to any "law, rule, or regulation *subject to the jurisdiction of the Commission*." 15 U.S.C. § 78u-6(h)(1)(A)(iii) (emphasis added). Thus, where an employee reports a violation of a federal law by the employer, the DFA only protects that employee against retaliation if the federal violation falls within the SEC's jurisdiction.

Furthermore, under traditional principles of statutory construction, the court must, if possible, give reasonable meaning to the Act's terms without rendering any of the language superfluous. *See TRW, Inc. v. Andrews*, 534 U.S. 19, 31 (2001). Accordingly, the court must read part (iii) of the anti-retaliation provisions in conjunction with the definition of whistleblower, which protects an individual from retaliation for reporting "information relating to a violation *of the securities laws*." (Emphasis added). Thus, harmonizing these provisions, a plaintiff seeking relief under anti-retaliation provision part (iii) must demonstrate that the disclosure at issue relates to a violation of federal securities laws.

Furthermore, anti-retaliation provision part (iii) only protects disclosures that are "required or protected" by laws, rules, or regulations within the SEC's jurisdiction. Thus, an employee is not protected from retaliation if the disclosure at issue – even if relates to an actual legal violation by the employer – concerns a disclosure that is not "required" or otherwise "protected" by a law, rule, regulation within the SEC's jurisdiction. *See Egan*, 2011 WL 1672066, at *6 ("[M]erely alleging the violation of a law or rule under the SEC's purview is not enough; a plaintiff must allege that a law or rule in the SEC's jurisdiction explicitly requires or

13

protects disclosure of that violation.")[10]

(4)   <u>Types of Companies Subject to the DFA's Anti-Retaliation Provisions</u>.

The court disagrees with the defendants' contention that the DFA applies only to public companies. The SEC's implementation of regulations relating to the Section 21F of the Exchange Act, as reflected in 76 Fed. Reg. 34,100 *et seq.*, necessarily concerned public companies, which are governed by the Exchange Act. Thus, although the SEC stated therein that "the retaliation procedures for internal reporting afforded by Section 21F(h)(1)(A) do not broadly apply to employees of entities other than public companies," that statement only concerned its interpretation of the DFA as it applies to entities (*i.e.*, public companies) subject to Section 21F of the Exchange Act.

Indeed, *Egan*, the case relied upon by the defendants, concerned the application of the category (iii) anti-retaliation protections to a privately held company. There, the plaintiff asserted that his employer terminated him after he reported that the defendants had violated the Exchange Act, rules promulgated by the Financial Industry Regulatory Authority ("FINRA"), and 18 U.S.C. § 1513(e). The court found that the DFA claim premised on the Exchange Act violations was not cognizable because the defendant was not a publicly traded company and, therefore, could not have violated the Exchange Act, which does not apply to privately held companies. By contrast, although the court found that the DFA retaliation claims premised on FINRA regulatory violations and 18 U.S.C. § 1513(e) were not actionable, it did not do so on the

---

[10]The *Egan* court also held that the DFA "protects whistleblowers who fulfill an existing duty to disclose, but does not protect those who report violations of SEC laws or regulations that do not impose such a duty." 2011 WL 1672066, at *6. That statement appears to be too narrow, because the DFA also protects whistleblowers who make "protected" disclosures, not just "required" disclosures.

14

basis that the defendants were privately held. Thus, the *Egan* court implicitly recognized that the DFA anti-retaliation provisions may apply to privately held companies under appropriate circumstances – albeit not the circumstances presented there.

(5)    Summary of Dodd-Frank Anti-Retaliation Requirements

Harmonizing all of these provisions, as the court must, a plaintiff seeking protection under § 78u-6(h)(1)(A)(iii) must at least show the following: (1) he or she was retaliated against for reporting a violation of the securities laws, (2) the plaintiff reported that information to the SEC or to another entity (perhaps even internally) as appropriate; (3) the disclosure was made pursuant to a law, rule, or regulation subject to the SEC's jurisdiction; and (4) the disclosure was "required or protected" by that law, rule, or regulation within the SEC's jurisdiction.

**B.    The FCPA**

Here, the Nollners contend that their employer violated the FCPA by bribing foreign officials and retaliated against the Nollners for reporting those violations internally. They argue that the FCPA constitutes a statute "subject to the jurisdiction of the Commission," that Mr. Nollner was required to report the FCPA violations by his employer, and that, therefore, the DFA protected him against retaliation.

The FCPA generally forbids individuals or companies from endeavoring to influence foreign officials by offering, promising, or giving them anything of value. *See* 15 U.S.C. §§ 78dd-1(a) (relating to issuers), 78dd-2(a) (relating to domestic concerns); 78dd-3(a) (relating to other "persons"); *Lamb v. Philip Morris, Inc.*, 915 F.2d 1024, 1027-28 (6th Cir. 1990). Specifically, the FCPA prohibits payments to foreign officials directly or indirectly for purposes of: "(i) influencing any act or decision of such foreign official in his official capacity, (ii)

15

inducing such foreign official to do or omit to do any act in violation of the lawful duty of such official, or (iii) securing any improper advantage . . . in order to assist [the entity making the payment] in obtaining or retaining business for or with, or directing business to, any person." 15 U.S.C. § 78dd-1(a)(1). The primary purpose of the law is to promote confidence in international trading relationships and domestic markets. *Lamb*, 915 F.2d at 1028.

The FCPA applies, *inter alia*, to any "issuer" or "domestic concern," as defined by the Act. An "issuer" is any company that is registered pursuant to Section 12 of the Exchange Act or that is required to file reports with the SEC pursuant to the Exchange Act § 15(d), while a "domestic concern" includes "any individual who is a citizen, national, or resident of the United States." 15 U.S.C. §§ 78dd-1(a); 78dd-2(h)(1). Here, although the defendants are not "issuers" of securities, the defendants are citizens of the United States and, therefore, constitute "domestic concerns" that are subject to the FCPA.

The FCPA provides both criminal and civil enforcement mechanisms. The Department of Justice ("DOJ") has sole responsibility for all criminal enforcement of the FCPA. As to civil enforcement, the SEC has enforcement responsibility over FCPA violations by issuers, while the DOJ has enforcement responsibility over FCPA violations by domestic concerns and other non-issuer entities subject to the FCPA. *See id.* § 78dd-2(d) (authorizing Attorney General to bring civil enforcement action for injunctive relief for violations by domestic concerns); 78dd-2(g) (authorizing Attorney General to recover civil penalties and enforce criminal penalties against domestic concerns); 78ff(c) (authorizing SEC to bring civil enforcement actions for violations of FCPA by issuers); *see also* DOJ FCPA "Layperson's Guide," www.justice.gov/criminal/fraud/fcpa/docs/lay-persons-guide.pdf, at p. 2; FINRA Regulatory

Notice 11-12, Foreign Corrupt Practices Act, 2011 WL 1086576, at *2 (Mar. 18, 2011). Thus, the jurisdiction of the SEC with respect to the FCPA violations is limited only to civil actions to enforce violations by *issuers*, but does not encompass FCPA violations by domestic concerns, which are subject to exclusive DOJ enforcement (civil and/or criminal). Finally, although the statute itself is silent on the issue, the Sixth Circuit has held that the FCPA does not create a private right of action for post-violation claims. *See Lamb*, 915 F.2d at 1029-30.[11]

Here, because the defendants are not issuers, only the <u>DOJ</u> – not the SEC – has jurisdiction over them with respect to FCPA violations.

### C. Interaction Between the FCPA and the Dodd-Frank Act

The defendants contend that the FCPA allegations, even if assumed to be true, do not support a claim for relief under the DFA. First, they argue that, because they are not "issuers" as defined by the FCPA, they are not subject to the jurisdiction of the SEC, thereby exempting them from potential liability for FCPA violations under the DFA, which applies only to entities subject to SEC jurisdiction. Second, the defendants argue that, even if they were subject to the DFA's anti-retaliation provisions, the Nollners have not and cannot identify any aspect of the FCPA that "required" Mr. Nollner to disclose FCPA violations or "protected" him for doing so, as required by DFA § 78u-6(h)(1)(A)(iii). In response, the Nollners contend that Mr. Nollner was required to disclose the alleged bribery to avoid personal criminal prosecution under the

---

[11]*Lamb* does not directly address whether the FCPA permits a private cause of action for pre-violation claims, such as claims for injunctive relief. *See* 915 F.2d at 1029-30. Regardless, here, the Nollners seek only post-violation relief relative to the FCPA violations, not injunctive relief for continuing or prospective FCPA violations.

FCPA.[12]  The Nollners do not cite to any specific provision of the FCPA or any other legal authority in support of this position.  Furthermore, the Nollners do not contest the defendants' representations that they are not "issuers" for purposes of the FCPA.

As an initial matter, it appears that the allegations in the Complaint, if proven, would establish that the defendants (or their related companies) violated the FCPA.  A domestic concern violates the FCPA if, among other things, it bribes a "foreign official" or "any person, while knowing that all or a portion of such money or thing of value will be offered, given, or promised, directly or indirectly, to any foreign official . . . ."  § 78dd-2(a)(3).  The Complaint and the July 30, 2009 letter attached thereto state that the defendants knowingly paid bribes to Indian authorities directly and/or indirectly through the contractor and architectural firm.  (First Am. Compl. ¶ 43; *id.*, Ex. C.)

Nevertheless, even assuming it were proven that the defendants violated the FCPA and that they terminated the Nollners because Mr. Nollner reported those violations internally, the Nollners' claim under the FCPA would still fail.  The Nollners' position is essentially that, because the SEC retains enforcement authority over FCPA violations by issuers, the court should interpret the DFA as protecting *any* employee who reports an FCPA violation by his employer, even if that FCPA violation is committed by an entity that is otherwise beyond the SEC's jurisdiction and has no relationship to the SEC.  However, the plain terms of the DFA concern alleged violations of securities laws and the actions of securitized and publicly traded companies

---

[12]The Nollners also contend that the defendants did not contest that the disclosures were "protected" by the FCPA, thereby waiving that argument.  This contention is without merit: the IMB Defendants  repeatedly argue that the Nollners have failed to establish that the disclosures were "required or *protected*" by the FCPA.  (Docket No. 7 at pp. 15-17 (emphasis added).)

18

that are required to make filings with the SEC. Accordingly, the court will not interpret the DFA as extending its whistleblower protections to companies that otherwise have no relationship to the SEC and that have not committed securities violations.

Here, because the defendants are not "issuers" for purposes of the FCPA, they are not "subject to the jurisdiction" of the SEC with respect to FCPA violations. Moreover, the violations reported by Mr. Nollner do not "relate to violations of the securities laws" (*i.e.*, he is not a "whistleblower" under the DFA) and do not concern actions by a company otherwise subject to SEC jurisdiction. Thus, even assuming the allegations to be true, the Nollners may not maintain DFA retaliation claims premised on their reporting of potential FCPA violations by the defendants.[13] Therefore, the court will dismiss the DFA claim with prejudice.

The court is constrained to reach this result because of the limited scope of the DFA and the apparent lack of remedies available to individual FCPA whistleblowers. Although it appears that the DFA conceivably could protect FCPA whistleblowers who work for "issuers," that is not the circumstance presented here. Moreover, the FCPA does not itself protect whistleblowers: it contains no anti-retaliation provisions and affords no private cause of action. In some jurisdictions, plaintiffs have successfully plugged this gap by premising a state law cause of action for retaliatory discharge on the disclosure of FCPA violations, *see, e.g.*, *D'Agostino v. Johnson & Johnson, Inc.*, 628 A.2d 305, 321 (N.J. 1993); *Thompson v. St. Regis Paper Co.*, 685 P.2d 1081, 1090 (Wash. 1984); *Kirk v. Shaw Envt'l, Inc.*, No. 1:09-cv-1405, 2010 WL 1387887, at *6 (N.D. Ohio Mar. 31, 2010) (applying Ohio law). However, some jurisdictions do not

---

[13]Because the DFA claims fail in any case, the court need not reach the question whether a whistleblower under the DFA is "required" to report conduct that, if not reported, could subject that individual to potential criminal prosecution.

recognize a state law cause of action premised on FCPA whistleblowing, even where reporting violations of certain federal policies may support a state law retaliatory discharge claim, *see Pratt v. Caterpillar Tractor Co.*, 500 N.E.2d 1001, 1003 (Ill. App. Ct. 1986) (finding that FCPA did not implicate a sufficient Ohio policy interest to support an Ohio retaliatory discharge claim), and other jurisdictions do not recognize a cause of action premised on violations of *any* federal statute, *see McCarthy v. Tex. Instruments, Inc.*, 999 F. Supp. 823, 829 (E.D. Va. 1998) (applying Virginia law). *See also* Matt Vega, *The Sarbanes Oxley Act and the Culture of Bribery: Expanding the Scope of Private Whistleblower Suits to Overseas Employers*, 46 Harv. J. on Legis. 425, 477 (2009) ("[S]tate laws fail to promote FCPA policy consistently across state lines much less the global market.")  At any rate, absent an implied FCPA private cause of action, which the Sixth Circuit has rejected, it falls to Congress to protect individual FCPA whistleblowers who are not otherwise protected from retaliation under state or federal law for disclosing FCPA violations.

## II.    <u>Jurisdictional Concerns</u>

### A.    **Applicable Law**

When it appears that the court may not have jurisdiction over the claims presented, the court may consider the issue *sua sponte*.  *See Things Remembered, Inc. v. Petrarca*, 516 U.S. 124, 132 n.1, 116 S. Ct. 494, 133 L. Ed. 2d 461 ("[E]very federal court, whether trial or appellate, is obliged to notice want of subject matter jurisdiction on its own Motion.") (Ginsburg, J., concurring); *Answers in Genesis of Ky., Inc. v. Creation Ministries Int'l., Ltd.*, 556 F.3d 459, 465 (6th Cir. 2009) ("[F]ederal courts have a duty to consider their subject matter jurisdiction in regard to every case and may raise the issue *sua sponte*.")  Here, the defendants removed this

action on the grounds that the court had original federal question jurisdiction over the DFA claim and supplemental jurisdiction over the state law claims. (Docket No. 1.) However, the court has found that the DFA claim fails as a matter of law and must be dismissed, leaving only pendent state law claims. Under these circumstances, the court must consider *sua sponte* whether it retains jurisdiction over this case.

Under 28 U.S.C. § 1331, "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, law or treaties of the United States." A claim falls within the court's original jurisdiction "only in those cases in which a well-pleaded Complaint establishes either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law." *Eastman v. Marine Mech. Corp.*, 438 F.3d 544, 550 (6th Cir. 2006). "[T]he removal statute should be strictly construed and all doubts resolved in favor of remand." *Id.*

Here, the First Amended Complaint does not assert any federal claims or issues other than the DFA/FCPA claim. Nevertheless, "a case may arise under federal law where the vindication of a right under state law necessarily turn[s] on some construction of federal law," *Merrell Dow Pharm., Inc. v. Thompson*, 478 U.S. 804, 808, 106 S. Ct. 3229, 92 L. Ed. 2d 650 (1986) (internal quotation marks omitted), provided that the contested federal issue is "a substantial one, indicating a serious federal interest in claiming the advantages thought to be inherent in a federal forum." *Grable & Sons Metal. Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 313, 125 S. Ct. 2363, 162 L. Ed. 2d 257 (2005). Because the court is raising the issue *sua sponte*, it will consider the First Amended Complaint expansively for purposes of this analysis, in order to determine whether any of the Nollners' state law claims implicate a federal

21

interest that supports "arising under" jurisdiction.

## B. Application

The First Amended Complaint asserts claims for breach of contract, promissory estoppel, and retaliatory discharge. Although the parties dispute whether Tennessee law or Virginia law applies to the state law claims, the court need not resolve this dispute because the state law claims would not present a federal question in either case.

### 1. Breach of Contract and Promissory Estoppel Claims

The breach of contract claim, whether arising under Tennessee or Virginia law, plainly does not incorporate any federal issues. Similarly, the promissory estoppel claim, which would only be viable if Tennessee law applies (*see W.J. Shafer & Assocs., Inc.*, *v. Cordant, Inc.*, 493 S.E.2d 512, 516 (Va. 1997) (holding that Virginia does not recognize a promissory estoppel cause of action), does not incorporate any federal issues.[14]

### 2. Virginia Retaliatory Discharge Claim

As to the retaliatory discharge claim, in Virginia, a non-state employee may only maintain a retaliatory discharge claim premised on a violation of a Virginia statute – not a federal statute. *See Bowman v. State Bank of Keysville*, 331 S.E.2d 797 (Va. 1985); *Lockhart v. Com. Educ. Sys. Grp.*, 439 S.E.2d 328, 331-332 (1994); *McCarthy v. Tex. Instruments, Inc.*, 999

---

[14]The defendants have reserved the right to assert a "constitutional ministerial exception" defense, as recognized by the Supreme Court in *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, __ U.S. __, 132 S. Ct. 694, 181 L. Ed. 2d 650 (2012). If a complaint "presents only a state law claim, a federal defense does not create federal question jurisdiction." *Kerr-McGee Chem. Corp. v. Illinois*, 459 U.S. 1049, 1050, 103 S. Ct. 469, 74 L. Ed. 2d 618 (1982). Therefore, even if the Nollners' claims were subject to a viable constitutional ministerial exception defense by the defendants, the presence of that defense would not create federal question jurisdiction here.

22

F. Supp. 823, 829 (E.D. Va. 1998); *Oakley v. May Dep't Stores Co.*, 17 F. Supp. 2d 533, 536 (E.D. Va. 1998). Thus, if Virginia law applies, no state law claim asserted by the Nollners could be premised on a federal policy violation, FCPA or otherwise.[15]

3.  Tennessee Retaliatory Discharge Claims

By contrast, the Tennessee retaliatory discharge claims may be premised on federal policy violations. Under the TPPA, an employee may not be discharged solely for refusing to participate in or remain silent about "illegal activities," Tenn. Code Ann. § 50-1-304(b), which are defined to include violations of state or *federal* criminal or civil codes or any regulation intended to protect the public health, safety, or welfare. *Id.* § 304(a)(3). Tennessee also recognizes a substantially similar common law claim for retaliatory discharge.[16] *Webb v. Nashville Area Habitat for Humanity, Inc.*, 346 S.W.3d 422, 437-38 (Tenn. 2011). To support a common law or TPPA retaliatory discharge claim, the plaintiff must show that his employer violated a "well-defined and established public policy." *Guy*, 79 S.W.3d at 535. The inquiry "is not limited to whether a particular law or regulation has been violated; rather, our inquiry focuses on whether some important public policy interest embodied in the law has been furthered by the whistleblowing activity." *Id.* (internal quotation omitted). Accordingly, a plaintiff may

---

[15]If the Nollners were to re-plead their claims, it is possible that Mr. Nollner's disclosures concern a violation of Virginia policy that would support a *Bowman* retaliation claim. However, the court need not reach this issue, because it would not affect the jurisdictional analysis.

[16]Under the TPPA, a plaintiff must show that the employee was terminated solely for refusing to participate in illegal activities, while the common law claim only requires the plaintiff to show that the violation was a "substantial factor" in the plaintiff's discharge. *Guy v. Mut. of Omaha Ins. Co.*, 79 S.W.3d 528, 535 (Tenn. 2002). Courts often analyze TPPA and common law retaliatory discharge claims together. *See, e.g.*, *Bright v. MMS Knoxville, Inc.*, No. M2005-02668-COA-R3-CV, 2007 WL 2262018, at *3 (Tenn. Ct. App. Aug. 7, 2007); *Smith v. C.R. Bard, Inc.*, 730 F. Supp. 2d 783, 797 (M.D. Tenn. 2010).

make out a Tennessee retaliatory discharge claim premised on a violation of federal policy under appropriate circumstances. *See, e.g., Conley v. Yellow Freight Sys., Inc.*, 521 F. Supp. 2d 713, 728 (E.D. Tenn. 2007) (finding that employer could be liable under TPPA for retaliating against employee who reported employer's violations of the Federal Motor Carrier Safety Regulations).

Here, the Nollners allege that the structure being built in India violated Tennessee building codes and criminal laws concerning building construction (First Am. Compl. ¶ 38), and that the defendants committed bribery in violation of the FCPA (*id.* ¶ 57). Although not explicitly stated in the paragraphs articulating the retaliatory discharge claims, the court will assume that the Nollners are alleging that they were discharged because Mr. Nollner reported violations of both state law (such as building codes) and federal law (*i.e.*, the FCPA). Although this court has not located a Tennessee decision determining whether the FCPA constitutes a "well-defined and established public policy" for retaliatory discharge purposes under Tennessee law, the court will assume that to be the case, for purposes of this analysis.

Even under these assumptions, the retaliatory discharge claims do not present a federal question, because "a state-law employment action for wrongful termination in violation of federal public policy does not present a substantial federal question over which federal courts may exercise 'arising under' jurisdiction under 28 U.S.C. § 1331." *Eastman*, 438 F.3d at 553 (holding that Ohio state law retaliatory discharge claim did not present a federal question, where claim was premised on reporting violations of federal false claims statutes); *see also Long v. Bando Mfg. of Am., Inc.*, 201 F.3d 754, 757-61 (6th Cir. 2000) (holding that Kentucky state law retaliatory discharge claim premised on both federal and state law violations did not present a substantial federal question). This is particularly the case where the underlying alleged federal

24

policy does not create a private cause of action, a fact that reflects "an important signal to [Congress's] view of the substantiality of the federal question involved." *Eastman*, 438 F.3d at 552. The "sound division of labor between state and federal courts envisioned by Congress . . . would be upset drastically if state public policy claims could be converted into federal actions by the simple expedient of referencing federal law as the source of that public policy." *Id.* at 553. Accordingly, here, even if it were shown that the defendants violated the FCPA – a federal statute that does not afford the Nollners a private cause of action – and that the Nollners are protected by Tennessee law against retaliation for disclosing those violations, the Tennessee retaliatory discharge claim would not involve a federal question over which this court may exercise "arising under" jurisdiction pursuant to 28 U.S.C. § 1331.

In sum, if Virginia law applies, the Nollners cannot allege any federal issue as a predicate to the retaliatory discharge claim in the first instance. If Tennessee law applies, the retaliatory discharge claim does not present a substantial federal question, even though the Nollners could base that claim on federal policy violations. Thus, the court finds that this lawsuit does not present a federal question, regardless of whether Virginia law or Tennessee law governs the state law claims.

### III.    <u>Supplemental Jurisdiction</u>

Under 28 U.S.C. § 1367(c)(3), a district court may decline to exercise supplemental jurisdiction over related state law claims if the court "has dismissed all claims over which it has original jurisdiction." "[A] district court has discretion to remand pendent state-law claims rather than dismissing them, if the values of economy, convenience, fairness, and comity so dictate." *Long*, 201 F.3d at 761 (citing *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 108 S.

25

Ct. 614, 98 L. Ed. 2d 720 (1988)).

This case is analogous to *Long*, in which the plaintiff asserted claims under both federal and state law, including a state law claim that the employer had terminated him for disclosing the employer's alleged violations of both state and federal law. 201 F.3d at 756. The plaintiff dismissed one federal claim and the court granted summary judgment to the defendant on the other, leaving no federal claims. *Id.* at 756-57. The district court declined to exercise supplemental jurisdiction over the pendent state law claims, including the retaliatory discharge claim premised in part on federal statutory violations, and remanded the action to state court. *Id.* at 757. On appeal, the Sixth Circuit found that the court correctly determined that the state law retaliatory discharge claim did not support federal question jurisdiction and that the district court had properly exercised its authority to remand rather than dismiss the state law claims pursuant to 28 U.S.C. § 1367(c). *Id.* at 761; *see also Eastman*, 438 F.3d at 554 (directing federal district court to remand action to state court, where state law retaliatory discharge claim premised on federal policy violation did not present a federal question).

Here, the court has determined that the FCPA claim, which is the only federal cause of action in the First Amended Complaint, must be dismissed pursuant to Fed. R. Civ. 12(b)(6). The court has also determined that the pendent state law claims do not present a substantial federal question over which the court has original jurisdiction, regardless of whether Tennessee or Virginia law applies, and the parties are not diverse. This lawsuit remains in its earliest stages and will appropriately be resolved in a state forum. Thus, pursuant to *Long* and *Eastman*, the court will decline to exercise supplemental jurisdiction over the pendent state law claims and will remand the action to state court.

26

Because the court is declining to exercise jurisdiction over the pendent state law claims, the court will not address the merits of the Motions to Dismiss as they relate to the state law claims (including the choice of law issue) or to venue. For the same reason, the court will not address the merits of the defendants' Motions to Strike.

## CONCLUSION

For the reasons expressed herein, the IMB Defendants' Motion to Dismiss will be granted in part and denied in part as moot, SBC's Motion to Dismiss will be denied as moot,[17] the IMB Defendants' Motion to Strike will be denied as moot, and SBC's Motion to Strike will be denied as moot. The Nollners' DFA claim will be dismissed with prejudice and the court will decline to exercise supplemental jurisdiction over the remaining state law claims. The court will remand this action to Davidson County Circuit Court for further proceedings.

An appropriate order will enter.

Enter this 3rd day of April, 2012.

ALETA A. TRAUGER
United States District Judge

_____

[17] The clerk will be directed to close SBC's parallel Motion to Dismiss in the now-consolidated companion case on the same basis. (*See* Case No. 3:12-cv-00043, Docket No. 13.)

27